# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

DARNELL ROBERT BONNER,

        Plaintiff,

        v.                            Case No. 05-C-1076

DAVID BETH and
LIEUTENANT SCHLECHT,

        Defendants.

## DECISION AND ORDER

      Plaintiff Darnell Robert Bonner, who is currently detained at the Winnebago County Jail, filed this *pro se* civil rights action pursuant to 42 U.S.C. § 1983. On April 11, 2006, the court granted the plaintiff's petition for leave to proceed *in forma pauperis* on a claim that the defendants were deliberately indifferent to dangerous conditions at the Kenosha County Detention Center. The defendants have filed a motion for summary judgment, which will be addressed herein.

      The court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the matter arises under federal statutes. Venue is proper under 28 U.S.C. § 1391. The case was assigned according to the random assignment of civil cases pursuant to 28 U.S.C. § 636(b)(1)(B) and General Local Rule 72.1 (E.D. Wis.). The parties have consented to United States magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c) and General Local Rule 73.1 (E.D. Wis.).

# SUMMARY JUDGMENT STANDARD

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *McNeal v. Macht*, 1458, 1460-61 (E.D. Wis. 1991). "Material facts" are those facts that, under the applicable substantive law, "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material facts" is "genuine" is "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The burden of showing the needlessness of trial – (1) the absence of a genuine issue of material fact and (2) an entitlement to judgment as a matter of law – is upon the movant. However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Anderson*, 477 U.S. at 267; *see also Celotex Corp.*, 477 U.S. at 324 ("proper" summary judgment motion may be "opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves . . ."); Fed. R. Civ. P. 56(e) ("When a summary judgment motion is made and supported as provided in [Rule 56(c)], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavit or otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial"). "Rule 56(c) mandates the entry of summary judgment, . . . upon motion, against a party who fails to establish the existence of an element essential to that party's

Case 2:05-cv-01076-WEC   Filed 07/31/07   Page 2 of 22   Document 57

case and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmoving party. *Johnson v. Pelker*, 891 F.2d 136, 138 (7th Cir. 1989). "However, we are not required to draw every conceivable inference from the record – only those inferences that are reasonable." *Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991) (citation omitted).

## FACTS[1]

The plaintiff filed his complaint while an inmate at the Kenosha County Detention Center (KCDC). (Complaint at 1). The plaintiff is currently detained at the Winnebago County Jail. Defendant David Beth is the Kenosha County Sheriff. (Affidavit of David Beth [Beth Aff.] ¶ 3). Defendant Lt. Schlecht is the Facility Administrator of the KCDC. (Affidavit of Mark Schlecht [Schlecht Aff.] ¶ 3).

The court permitted the plaintiff to proceed on an individual capacity claim against defendant Lt. Schlecht based on allegations that Lt. Schlecht was deliberately indifferent to dangerous shower conditions in which the plaintiff claims to have fallen. (Court's Order of April 11, 2006, at 7). The plaintiff was also permitted to proceed on a claim against defendants Lt. Schlecht and Sheriff Beth in their official capacities seeking injunctive relief from the policy of requiring inmates to shower in restraints. *Id.* at 8.

---

[1] Facts are taken from the defendants' Proposed Findings of Fact and the plaintiff's Affidavit in Opposition to Defendants' Motion for Summary Judgment. Unless otherwise indicated, facts are undisputed.

3

The plaintiff alleges that he was transferred to the KCDC from the Kenosha County Pre-Trial Facility on September 14, 2005. (Complaint at 4). The plaintiff was housed in the H-West Unit. *Id.* He was assigned to this unit based on his lack of compliance with inmate rules. (Schlecht Aff. ¶ 18).

Inmates assigned to H-West, the KCDC disciplinary segregation unit, are required to wear a restraint called a "treatment belt" when out of their cells for recreation time, including during showers. (Schlecht Aff. ¶ 4). The treatment belt consists of a Velcro waist band secured by a padlock and connected to two tethers of approximately 12" to 14" in length, at the end of each of which is a handcuff. (Schlecht Aff. ¶ 5). Both violent and non-violent individuals are housed in H-West. (Schlecht Aff. ¶ 6). However, it is the only unit which houses violent individuals. *Id.* The disciplinary segregation inmate restraint procedure is in effect for the protection of staff and inmates. (Schlecht Aff. ¶ 7). The treatment belt permits inmates to have more mobility than other forms of restraints, but restricts their ability to fight with staff, protecting them from harm. (Schlecht Aff. ¶ 8).

On or about September 19, 2005, inmates housed "on the top tier" were scheduled to shower. (Complaint at 4). Officers Freeman and Gonzalez retrieved the plaintiff for his shower, placing him in a treatment belt. *Id.* at 5. The plaintiff asked Officers Freeman and Gonzalez whether he was required to shower in the restraints and was answered affirmatively. *Id.* The plaintiff alleges that he asked why and was told that it was procedure. *Id.* The plaintiff alleges that he is 5' 3" tall, and that the shower button was 6' 6" or 6' 7" in height. *Id.* To reach the shower button, the plaintiff alleges he had to jump or stand on his "tippy toes" and that this was very painful on his wrist because of the restraints. *Id.* The plaintiff alleges he discontinued his

4

shower based on the pain to his wrists and his struggle to shower, and that Officers Gonzalez and Freeman escorted him back to his cell. *Id.* at 6.

Ms. Janice Bulanda is employed as a Detentions System Coordinator by the Kenosha County Sheriff's Department. (Affidavit of Janice Bulanda [Bulanda Aff.] ¶ 2). Ms. Bulanda is one of the custodians of records, including of the plaintiff's detentions records. (Bulanda Aff. ¶ 3). In this capacity, Ms. Bulanda recently reviewed the regularly kept files for the Kenosha County Detentions System, which reflect that, as is relevant to this action, the plaintiff was detained in Kenosha County from August 3 to November 22, 2005. (Bulanda Aff. ¶¶ 4-6). Ms. Bulanda reviewed the complaint and the court order screening the complaint. (Bulanda Aff. ¶ 5). Ms. Bulanda also reviewed the grievances filed by the plaintiff and determined that he filed only one grievance and one grievance appeal relating to the deliberate indifference claim upon which the court permitted him to proceed. (Bulanda Aff. ¶¶ 8-9).

On September 21, 2005, the plaintiff filed a grievance regarding the manner in which he had to shower. (Bulanda Aff. ¶ 10, Ex. A at 1; *see also* Complaint at 6, Ex. X). This grievance alerted defendant Lt. Schlecht to the plaintiff's concerns about the H-West shower. (Schlecht Aff. ¶ 23). The plaintiff claimed showering in restraints amounted to cruel and unusual punishment. (Bulanda Aff. ¶ 10, Ex. A at 1-2; Complaint at 6, Ex. X). The plaintiff stated in his grievance that the one time he had showered previously, it "was painful, suffering and neverless cruel." (Bulanda Aff. ¶ 10, Ex. A at 1; Complaint at 6, Ex. X). The plaintiff stated in his grievance that he is 5' 3" tall and had to jump to reach the shower button because of the restraints he was placed in, also stating, "It is impossible to shower in restraints like these." (Bulanda Aff. ¶ 10, Ex. A

5

at 1-2; Complaint at 6, Ex. X). The plaintiff stated, "This should be change[d] for the safety of myself and similar situated inmates." (Bulanda Aff. ¶ 10, Ex. A at 2; Complaint at 6, Ex. X).

On September 23, 2005, defendant Lt. Schlecht responded to the plaintiff's grievance by stating: "The policies in place to maintain safety and security will not change. In regard to your concern about the height of the shower button, it will be looked into. Thank you for bringing it to our attention." (Bulanda Aff. ¶¶ 10-11, Ex. A at 1; Complaint at 6, Ex. 3).

The next day, the plaintiff filed an appeal of this grievance response. (Bulanda Aff. ¶ 12, Ex. B; Complaint at 6). The plaintiff reiterated his dissatisfaction with the shower policy, stating it "impose[d] pain and suffering because of the way I have to shower. I'm unable to shower because I am placed in handcuffs attached to a Velcro waist belt." (Bulanda Aff. ¶ 12, Ex. B at 1). The plaintiff described his prior use of the shower as "very painful, torturing, humiliating and dangerous." (Bulanda Aff. ¶ 12, Ex. B at 1). The plaintiff stated that the "grievance officer" had "not offered a satisfy [sic] resolution to my circumstance which cause me to remain taking a shower in my cell with a towel and soap." (Bulanda Aff. ¶ 12, Ex. B at 1-2). The plaintiff requested an "investigation on this issue." (Bulanda Aff. ¶ 12, Ex. B at 2).

On September 28, 2005, defendant Lt. Schlecht responded to the plaintiff's appeal. (Bulanda Aff. ¶ 13, Ex. C; Complaint at 6, Ex. 3). Defendant Lt. Schlecht's response indicated that the matter had already been addressed and that: "There will be no further response." (Bulanda Aff. ¶ 13, Ex. C at 1; Complaint at 6, Ex. 3).

After allegedly not showering for a week, the plaintiff decided to shower again on September 28, 2005. (Complaint at 6). Officer Molinaro secured the plaintiff in a treatment belt. (Complaint at 6; Affidavit of Anthony Molinaro [Molinaro Aff.] ¶ 3). The plaintiff alleges he

6

again found it difficult to shower in restraints. (Complaint at 7). He pulled the treatment belt up to create slack and jumped to push the shower button. *Id.* The plaintiff alleges that he lost his balance and fell forward hitting his head on the front shower wall. *Id.* The plaintiff further alleges that he "tried to hold [himself] up with [his] hands, but the handcuffs was too much." *Id.* He alleges he "push[ed] himself off the wall, but then" fell backwards, landing on his rear end and his right elbow. *Id.* The plaintiff alleges he could not catch himself because of the handcuffs and could only land on his right elbow. *Id.* According to the complaint, inmates heard him fall because it was loud and he yelled out in pain. *Id.*

Officers Molinaro and Marzette were working in the officers' station and did not hear anything. (Molinaro Aff. ¶¶ 4, 6). An inmate contacted Officer Molinaro using the cell intercom and indicated the plaintiff had fallen in the shower. (Molinaro Aff. ¶ 5; Complaint at 7). Officers Marzette and Molinaro immediately responded to the shower. (Molinaro Aff. ¶ 7; Complaint at 7). Through the obstructed view of the shower curtain, Officer Molinaro observed the plaintiff seated on the shower floor. (Molinaro Aff. ¶ 8). Officer Molinaro immediately called for Corporals Naef and Simpson, the on-duty supervisors, to respond. (Molinaro Aff. ¶ 9). It is policy to contact supervising officers in any emergency or injury situation, and it is standard for both supervising officers to respond. (Molinaro Aff. ¶ 10). Corporals Naef and Simpson responded immediately. (Affidavit of Daniel Naef [Naef Aff.] ¶ 9; Complaint at 7). Officer Molinaro pulled back the shower curtain. (Molinaro Aff. ¶ 11). Officer Molinaro observed the plaintiff to be seated on his rear end on the shower floor with his knees bent and his feet on the floor. (Molinaro Aff. ¶ 12). The plaintiff's back was to the left corner of the shower stall. (Molinaro Aff. ¶ 13).

7

Officer Molinaro and Corporal Naef each made observations about the plaintiff's physical condition. (Molinaro Aff. ¶ 14; Naef Aff. ¶ 10). These observations led the responding officers to doubt the validity of the plaintiff's claim that he fell while showering. (Molinaro Aff. ¶ 14; Naef Aff. ¶ 11). According to Molinaro and Naef, the plaintiff already had his towel securely wrapped around his waist; the plaintiff's hair was dry, as was his body; the plaintiff did not have soap on his body or in his hair; and the plaintiff's towel did not appear to be wet. (Molinaro Aff. ¶¶ 15-18; Naef Aff. ¶¶ 12-15).

The complaint alleges that the plaintiff had a large bump on his forehead and a swollen, red, bruised right wrist. (Complaint at 7). In addition, the plaintiff alleges that his rear end was so sore that he had to sleep on his stomach that night. *Id*.

When the responding staff arrived at the H-West shower, they did not observe the plaintiff to have serious injuries. (Molinaro Aff. ¶ 19; Naef Aff. ¶ 16). The plaintiff did not appear to be having difficulty breathing or to be in pain. (Molinaro Aff. ¶ 20; Naef Aff. ¶ 17). The plaintiff stood to his feet, and talked without difficulty. (Molinaro Aff. ¶ 21; Naef Aff. ¶ 18). At that time, the plaintiff reported having struck the temple area of the right side of his head on the shower wall. (Molinaro Aff. ¶ 22; Naef Aff. ¶ 19). No abrasion, redness or swelling of any kind to the plaintiff's right temple area was noted. (Molinaro Aff. ¶ 23; Naef Aff. ¶ 20). The plaintiff reported pain to his right wrist and elbow. (Molinaro Aff. ¶ 24; Naef Aff. ¶ 21). The responding staff did notice redness to the plaintiff's right wrist. (Molinaro Aff. ¶ 25; Naef Aff. ¶ 22). However, the area did not appear painful and the redness was consistent with rubbing against the handcuff. (Molinaro Aff. ¶ 26; Naef Aff. ¶ 23).

8

The plaintiff made no mention at this time of pain or injury to his forehead or rear end. (Molinaro Aff. ¶ 27; Naef Aff. ¶ 24). The plaintiff then walked to his cell without difficulty. (Molinaro Aff. ¶ 28; Naef Aff. ¶ 25). Upon arriving at his cell and sitting on his bunk, the plaintiff was again asked about the nature of his injuries. (Molinaro Aff. ¶ 29; Naef Aff. ¶ 26). At this time, the plaintiff altered his story to state he had struck his forehead, and not his right temple, on the shower wall. (Molinaro Aff. ¶ 30; Naef Aff. ¶ 27). The area of his forehead which the plaintiff indicated he had struck against the shower wall featured a prominent protrusion or "lump." (Molinaro Aff. ¶ 31; Naef Aff. ¶ 28). The protruded area was not scraped, bleeding, red or bruised. (Molinaro Aff. ¶ 32; Naef Aff. ¶ 29). Responding staff recalled that the same protrusion had been present on the plaintiff's forehead prior to the alleged shower incident on September 28, 2005. (Molinaro Aff. ¶ 33; Naef Aff. ¶ 30). Corporals Simpson and Naef examined the plaintiff's booking photograph and confirmed that the same protrusion was present in the same location of the plaintiff's forehead at the time of his booking. (Naef Aff. ¶ 31). The responding staff did not observe the protrusion on the plaintiff's forehead to be more pronounced, of a different shape, size or color, or otherwise changed in appearance from what they were familiar with prior to the plaintiff's alleged shower fall. (Molinaro Aff. ¶ 34; Naef Aff. ¶ 32).

The plaintiff disputes the defendants' description of his condition after the fall. The plaintiff avers:

> My forehead was bruised, with a lump on it, my wrist was swollen, red and bruised. My back was very sore and my right elbow was bruised. I also felt very dizzy and light headed. My body and hair were wet and I were [sic] issued a new towel to dry off with. Corporal Simpson had taken pictures of my bruised forehead and my swollen wrist. I was given 2 Tylenol and seen [sic] the nurse the following morning and was given an ice pack. My back were [sic] sore for approximately 2 days in a row. (See Exhibit E)

9

(Bonner Aff. ¶¶ 10-14.)

The plaintiff was not denied medical treatment. (Complaint at 12). He was given two Tylenol pills, checked on throughout the night and seen by the nurse in the morning, who gave him two additional Tylenol pills. *Id.* at 7-8. The plaintiff was seen again by the nurse at noon on September 29, and given more Tylenol and an ice bag for his forehead. *Id.* at 8. The plaintiff received more Tylenol on September 30. *Id.*

Defendant Lt. Schlecht recalls first becoming aware of any concerns regarding the H-West shower when, on December 9, 2004, a KCDC corporal informed him that the brief duration of the spray required inmates to frequently activate the on-button during a shower, which was more difficult for inmates of a shorter stature. (Schlecht Aff. ¶ 9). On December 10, 2004, defendant Lt. Schlecht personally requested that maintenance staff advise whether the situation could be rectified. (Schlecht Aff. ¶ 10; Affidavit of Norm Drissel [Drissel Aff.] ¶ 3). Based on defendant Lt. Schlecht's request, Mr. Norm Drissel, an onsite maintenance worker at the KCDC, examined the H-West valve. (Drissel Aff. ¶¶ 4-5). Mr. Drissel determined that a part was cracked, resulting in a shorter shower spray than the factory preset. (Drissel Aff. ¶ 5). Mr. Drissel replaced the damaged valve, extending the spray so that inmates had to press the shower button in H-West about half as often during a shower. (Drissel Aff. ¶ 6).

On January 13, 2005, Corporal Daniel Naef informed defendant Lt. Schlecht of concerns with the H-West shower unit. (Naef Aff. ¶ 3). At the time, the unit shower button was located approximately 6' from the shower floor. (Naef Aff. ¶ 4). Corporal Naef informed Lt. Schlecht that some inmates, particularly those of shorter stature, had difficulty pressing the shower button while wearing a treatment belt. (Naef Aff. ¶ 6). Lt. Schlecht timed the duration of the H-West

10

shower spray and determined that each actuation of the on-button resulted in a shower spray of 17 seconds. (Schlecht Aff. ¶ 12). Lt. Schlecht then informed Kenosha County maintenance personnel that some inmates could not reach the shower button while wearing a treatment belt. (Schlecht Aff. ¶ 13). Lt. Schlecht also explained to maintenance personnel the security reasons for the use of the treatment belt on disciplinary segregation inmates during recreation. (Schlecht Aff. ¶ 14). Lt. Schlecht further advised that the treatment belt procedure could not safely be modified due to the risk to staff and inmates. (Schlecht Aff. ¶ 15). This is because alternatives to the proper use and application of the treatment belt, including both handcuffs, can result in a disciplinary segregation inmate slipping out of the restraint and using it as a weapon against staff or as a tool to harm himself. (Schlecht Aff. ¶ 16). Lt. Schlecht requested that the location of the shower button be lowered from approximately 6' to a height of 4'. (Schlecht Aff. ¶ 17; Drissel Aff. ¶ 7; Affidavit of Ron Henning [Henning Aff.] ¶ 6). Lt. Schlecht requested "prompt action" and requested that maintenance workers inform him when the work was completed. (Schlecht Aff. ¶ 18).

On April 14, 2005, Mr. Ron Henning, Facilities Foreman of the Division of Facilities in the Kenosha County Department of Public Works, advised defendant Lt. Schlecht that a plumbing company would visit the KCDC within the week to examine the H-West shower. (Henning Aff. ¶¶ 6-7). Mr. Henning informed Lt. Schlecht that the plumbing company would investigate ways to retrofit the existing shower unit to accommodate the disciplinary segregation inmates. (Henning Aff. ¶ 7). Mr. Henning further advised Lt. Schlecht that, because the piping for the H-West shower was located in a solid wall, it would be extremely expensive to relocate the shower valve. (Henning Aff. ¶ 8).

11

Kenosha County maintenance employees and employees of the plumbing company worked together to identify and evaluate options for both accommodating shorter inmates in the H-West shower and accommodating safety and security concerns. (Henning Aff. ¶ 9; Drissel Aff. ¶ 8). They considered a number of factors in evaluating the retrofitting options they identified. (Henning Aff. ¶ 10; Drissel Aff. ¶ 9). Such considerations included the need to eliminate "hanging points" or areas on the plumbing fixtures from which an inmate could potentially hang himself. (Henning Aff. ¶ 11; Drissel Aff. ¶ 10). For safety and security, there could be no places where inmates could obscure or exchange objects. (Henning Aff. ¶ 17; Drissel Aff. ¶ 11). Staff could not be taken away from other duties by requiring them to operate the shower button. (Henning Aff. ¶ 13; Drissel Aff. ¶ 12). Water lines needed to be secured, given the propensity of inmates to tamper with plumbing fixtures. (Henning Aff. ¶ 14; Drissel Aff. ¶ 13). The fixtures needed to be easily removable for servicing, and the shut-off valve accessible. (Henning Aff. ¶ 15; Drissel Aff. ¶ 14). Funding for the shower retrofitting and preservation of Kenosha County resources were also considered as Mr. Henning budgeted for the project. (Henning Aff. ¶¶ 4-5, 16). Weighing these considerations, no simple solution was identified. (Drissel Aff. ¶ 15; Henning Aff. ¶ 17).

The design, safety, security and financing evaluation processes continued through the Fall of 2005. (Drissel Aff. ¶ 16; Henning Aff. ¶ 18). After an option was selected consistent with these considerations, the H-West shower unit was retrofitted to lower the shower button to a height of approximately 4'. (Drissel Aff. ¶ 17; Henning Aff. ¶ 19). The project was completed on December 8, 2005. (Drissel Aff. ¶ 18; Henning Aff. ¶ 20). Defendant Lt. Schlecht was advised the shower project was completed. (Drissel Aff. ¶ 19; Henning Aff. ¶ 21).

Defendant Lt. Schlecht is unaware of any other inmate reporting a fall in the H-West shower prior to the plaintiff's alleged fall. (Schlecht Aff. ¶ 21). Lt. Schlecht cannot recall grievances regarding any difficulty showering in restraints, perceived danger or injury associated with showering in restraints in H-West filed by any inmate prior to the plaintiff. (Schlecht Aff. ¶ 22).

Defendant Sheriff Beth oversees the entire Kenosha County Sheriff's Department. (Beth Aff. ¶ 2). Sheriff Beth does not have day-to-day involvement in the operations of the KCDC, though he is aware of the overall operations. (Beth Aff. ¶¶ 3-4). Sheriff Beth occasionally makes rounds of the KCDC, but does not recall having any personal contact with the plaintiff. (Beth Aff. ¶¶ 5, 7). Sheriff Beth reviewed the plaintiff's § 1983 complaint. (Beth Aff. ¶ 6). Sheriff Beth does not recall having received any correspondence regarding the matters about which the plaintiff complains. (Beth Aff. ¶ 8). It is Sheriff Beth's practice to review correspondence addressed to his attention. (Beth Aff. ¶ 9). If the correspondence concerns a detention related matter, it is Sheriff Beth's practice to forward the correspondence to the captain of the Detentions Division for investigation and response. (Beth Aff. ¶ 10). If Sheriff Beth had received correspondence from the plaintiff regarding the matters detailed in his § 1983 complaint, he would have forwarded such correspondence to the Captain pursuant to his practice. (Beth Aff. ¶ 11).

Defendant Sheriff Beth did not assign the plaintiff to KCDC or to the H-West Housing Unit. (Beth Aff. ¶ 12). Sheriff Beth was not personally involved in the adoption or enforcement of the H-West restraint procedures applicable to disciplinary segregation inmates. (Beth Aff. ¶ 13). Sheriff Beth was not personally aware of any perceived problem with the H-West shower. (Beth Aff. ¶ 14). Sheriff Beth was not involved in investigating, evaluating, selecting, or

13

budgeting for retro-fitting of the H-West shower at the times relevant to the plaintiff's complaint. (Beth Aff. ¶ 15).

**ANALYSIS**

The defendants contend that, 1) the plaintiff lacks the requisite standing to seek injunctive relief and the relief sought is unlikely to prevent future injury; 2) Lt. Schlecht was not deliberately indifferent; and 3) Lt. Schlecht is entitled to qualified immunity. The plaintiff contends that, 1) there are genuine issues of material fact that preclude summary judgment for the defendants on the plaintiff's deliberate indifference claim; 2) defendant Lt. Schlecht was deliberately indifferent; and 3) defendant Lt. Schlecht is not entitled to qualified immunity.

**1. Plaintiff's Claim for Injunctive Relief**

The defendants contend that the plaintiff lacks standing to assert his claim for injunctive relief because he cannot show that the defendants are likely to injure him again by virtue of the H-West restraint and shower procedures. In addition, the defendants argue that the plaintiff cannot show that the relief he seeks is likely to prevent future injury. The plaintiff does not address the defendants' contention that he lacks standing to seek injunctive relief against the defendants.

In order to invoke Article III jurisdiction, a plaintiff seeking injunctive relief must show that he is in immediate danger of sustaining some direct injury. *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983). In *Knox v. McGinnis*, 998 F.2d 1405, 1413-15 (7th Cir. 1993), the court held that a prisoner lacked standing to seek injunctive relief against the future use of a "black box" on prisoners in segregation because he had been released from segregation and returned to the general prison population where he was no longer subjected to the use of the "black box." In

14

reaching its decision, the court relied upon *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) and *O'Shea v. Littleton*, 414 U.S. 488 (1974).

In *Lyons*, the plaintiff sued the City of Los Angeles and several police officers, alleging that the officers stopped him for a routine traffic violation and applied a choke hold without provocation. He sought an injunction against future use of the choke hold unless the suspect threatened deadly force. The Supreme Court held that the plaintiff lacked standing to seek injunctive relief because he could not show a real or immediate threat of future harm. *Lyons*, 461 U.S. at 105. The Court relied upon its earlier decision in *O'Shea* in which the Court stated that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief…if unaccompanied by any continuing, present adverse effects." *O'Shea*, 414 U.S. at 495-96. In *O'Shea*, the plaintiffs had alleged discriminatory enforcement of criminal laws. The Court held that there was no case and controversy because "the threat to plaintiffs was not 'sufficiently real and immediate.'" *Id.* at 496-497. Similarly, in *Lyons*, the Court found that, although an allegation of an earlier choking was sufficient to confer standing for a damage claim, it did "nothing to establish a real and immediate threat" that the plaintiff would again be stopped for a traffic violation and a choke hold put on him. *Lyons*, 461 U.S. at 105.

In the instant case, the plaintiff cannot establish a real and immediate threat that he again will be housed in the H-West unit of the KCDC and subjected to the previously alleged shower procedures. The mere possibility that the plaintiff may again be incarcerated at the KCDC is too speculative and does not establish a real and immediate case or controversy. *Knox*, 998 F.2d at 1413-14; *see also Robinson v. City of Chicago*, 868 F.2d 959 (7th Cir. 1989). In light of the foregoing, the plaintiff lacks standing to pursue his claim for injunctive relief. Accordingly, the

15

defendants' motion for summary judgment as to the defendants' official capacity claim against defendants Lt. Schlecht and Sheriff Beth will be granted.

**2. Plaintiff's Individual Capacity Claim Against Defendant Lt. Schlecht**

As indicated, the plaintiff's individual capacity claim against defendant Lt. Schlecht is an Eighth Amendment deliberate indifference claim based on dangerous conditions in the H-West shower.[2] To prevail on an Eighth Amendment deliberate indifference claim, a plaintiff must produce evidence that satisfies two elements. *Hall v. Bennett*, 379 F.3d 462, 464 (7th Cir. 2004). The plaintiff has the burden of showing that: (1) the harm to the plaintiff was objectively serious; and (2) the official was deliberately indifferent to his health or safety. *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (citing *Cavalieri v. Shepard*, 321 F.3d 616, 620 (7th Cir. 2003)); *see also Farmer v. Brennan*, 511 U.S. 825, 834-37 (1994).

The defendants contend that the plaintiff cannot establish that defendant Lt. Schlecht acted with deliberate indifference. Specifically, they argue that the plaintiff cannot establish that defendant Lt. Schlecht knew that the plaintiff was "at serious risk of being harmed [and] decided not to do anything to prevent the harm from occurring even though he could have easily done so." (Defendants' Brief in Support of Motion for Summary Judgment [Defs.' Br.] at 20-21) (quoting *Board*, 394 F.3d at 478).

In response to the defendants' motion, the plaintiff first contends that there are genuine issues of material fact that preclude summary judgment for the defendants. The plaintiff asserts

---

[2] The plaintiff was a pretrial detainee at all times relevant and therefore his claim properly arises under the Fourteenth Amendment. *Jackson v. Ill. Medi-Car, Inc.*, 300 F.3d 760, 764 (7th Cir. 2002). However, courts apply the same Eighth Amendment deliberate indifference standard to claims arising under the Fourteenth Amendment (detainees) and Eighth Amendment (convicted prisoners) without differentiation. *Board v. Farnham*, 394 F.3d 469, 477-78 (7th Cir. 2005).

16

that the "affidavits of the plaintiff and the defendants are squarely contradictory to what injuries the plaintiff received and whether the plaintiff fell in the shower" and the "allegations in the plaintiff's affidavit portray that the plaintiff fell[] in the shower and sustain[ed] mild injuries, further the defendants were deliberate indifferent to the plaintiff['s] safety." (Plaintiff's Brief in Opposition to Summary Judgment [Pl.'s Br.] at 4.)

Next, the plaintiff contends that defendant Lt. Schlecht was deliberately indifferent. The plaintiff asserts that he forewarned the defendants, before he slipped and fell in the shower, to the danger of wearing restraints while showering, and that he feared for his safety. Moreover, he states that any reasonable person would know that placing the 5'3" plaintiff in the shower in restraints, where the shower button is approximately 6' from the floor, is an "extremely dangerous situation." (Pl.'s Br. at 7.) According to the plaintiff,

> Lt. Schlecht knew that I was at a serious risk of being harmed and decided not to do anything to prevent the harm from occurring, even though he could have easily done so. By Lt. Schlecht stating the policy is in place to maintain safety and security will not change (see Exhibit A) also by the defendant stating, there will be no further respond [sic], simply is disregarding the serious risk of the plaintiff. As result of the defendant['s] intentional and criminal reckless manner, the plaintiff was injured and suffer[ed] as a result.

(Pl.'s Br. at 12-13.)

The plaintiff also contends that requiring inmates to shower in restraints has been held unconstitutional, citing to *LeMaire v. Maass*, 12 F.3d 1444 (9th Cir. 1993). He goes on to state,

> The plaintiff will accept the allegations of on-going efforts to identify, fund and implement retrofitting of the H-west shower unit; but even given that's the case, the shower unit policy of wearing restraints while showering, still poses an un-safe situation, and given the fact, Lt. Schlecht stipulating that the policy of wearing restraints will not change, clearly demonstrates he was reckless and ill-consider [sic] of the plaintiff safety and by furthing [sic] stating there will be no further response.

17

*Id.* at 10. The plaintiff also cites to *Washington v. Israel*, 513 F. Supp. 1061, 1062 (E.D. Wis. 1981), and asserts that the court in that case discusses handcuffing during showers as unconstitutional.

The defendants concede, for the purposes of summary judgment, that the first prong of the Eighth Amendment claim is satisfied. Specifically, the defendants "accept that [the plaintiff's] Complaint states a serious medical need."[3] (Defs.' Br. at 20.) Thus, the court turns to whether defendant Schlecht was deliberately indifferent in this case.

First of all, the plaintiff's contention that requiring inmates to shower in restraints has been held unconstitutional is misplaced. The plaintiff cites to *LeMaire v. Maass*, 12 F.3d 1444 (9th Cir. 1993), which, *inter alia*, reversed the lower court's decision that the use of full mechanical restraints on inmates while they shower violates the Eighth Amendment. *Id.* at 1450. The Ninth Circuit stated:

> we do not find that shackling a dangerous inmate in a shower creates a sufficiently unsafe condition. Even if the floors of the shower are slippery and LeMaire might fall while showering, "slippery prison floors … do not state even an arguable claim for cruel and unusual punishment. *Jackson v. Arizona*, 885 F.2d 639, 641 (9th Cir. 1989). We believe *not* restraining a dangerous inmate like LeMaire when he is loose in the shower room creates a situation which is potentially far more dangerous than forcing him to shower while shackled.

*Id.* at 1457; *see also Branham v. Meachum*, 77 F.3d 626, 631 (2d Cir. 1996) (requiring an inmate on "lockdown" to shower while wearing leg irons does not state a claim under the Eighth Amendment). In addition, although the plaintiff states that in the case of *Washington v. Israel*,

---

[3] The court notes that the objective prong of the plaintiff's claim may also be characterized as an alleged unsafe condition of confinement, i.e., the shower, instead of a serious medical need. However, in either case, the same deliberate indifference standard applies. "Whether one characterizes the treatment received by [the prisoner] as inhuman conditions of confinement, failure to attend to his medical needs, or a combination of both, it is appropriate to apply the 'deliberate indifference' standard articulated in *Estelle*." *Helling v. McKinney*, 509 U.S. 25, 32 (1993) (quoting *Wilson v. Seiter*, 501 U.S. 294, 303 (1991)).

513 F. Supp. 1061 (E.D. Wis. 1981), handcuffing during showers is discussed as unconstitutional, that case does not even mention the issue.

It is undisputed that all inmates assigned to H-West, the KCDC disciplinary segregation unit, are required to wear a "treatment belt" during showers. This procedure is in effect for the protection of staff and inmates. The treatment belt permits inmates to have more mobility than other forms of restraints, but restricts their ability to fight with staff. "[I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). Maintaining jail security and effectively managing a detention facility are valid objectives which may justify the imposition of certain restrictions. *Id.* at 540. Based on the foregoing, the fact that defendant Lt. Schlecht followed KCDC policy by requiring the plaintiff to shower in the treatment belt is not, by itself, unconstitutional.

As indicated, the plaintiff contends that genuine issues of material fact preclude summary judgment for the defendants. Although the defendants express doubt concerning whether the plaintiff actually fell in the shower and the extent of the plaintiff's injuries, these disputes are not relevant to the ultimate issue of whether defendant Lt. Schlecht acted with deliberate indifference upon receiving the plaintiff's grievance concerning his difficulty showering.

It is undisputed that, as is relevant to this case, the plaintiff was detained at the KCDC from August 3, 2005 until November 22, 2005. On September 21, 2005, the plaintiff filed a grievance concerning the manner in which he had to shower. The plaintiff claimed that showering in restraints amounted to cruel and unusual punishment; that the one time he had showered previously, it "was painful, suffering and neverless cruel"; that he is 5'3" tall and had to jump to

19

reach the shower button because of the restraints.  (Bulanda Aff. ¶ 10, Ex. A.)  On September 23, 2005, defendant Lt. Schlecht responded to the plaintiff's grievance by stating: "The policies in place to maintain and security will not change.  In regard to your concern about the height of the shower button, it will be looked into.  Thank you for bringing it to our attention."  (Bulanda Aff. ¶ 10-11, Ex. A.)  On September 24, 2005, the plaintiff filed an appeal of the grievance.  He reiterated his dissatisfaction with the shower policy and stated that the "grievance officer" had "not offered a satisfy [sic] resolution to my circumstance which cause me to remain taking a shower in my cell with a towel and soap."  (Bulanda Aff. ¶ 12, Ex. B at 1-2.)  On September 28, 2005, defendant Lt. Schlecht responded to the plaintiff's appeal, indicating that the matter had already been addressed and that "[t]here will be no further response."  (Bulanda Aff. ¶ 13, Ex. C at 1; Complaint at 6, Ex. 3.)

It is undisputed that on September 28, 2005, the plaintiff lost his balance while jumping up to hit the shower button.  The plaintiff sustained injuries as a result of the fall.

Conduct is "deliberately indifferent" when the official has acted in an intentional or criminally reckless manner.  *Board*, 394 F.3d at 478.   "[T]he defendant must have known that the plaintiff 'was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even through he could have easily done so.'" *Id.* (citations omitted).  An inmate must allege "*actual* knowledge of *impending* harm *easily* preventable."  *Delaney v. DeTella*, 256 F.3d 679, 683 (7th Cir. 2001) (citations omitted).  "A failure of prison officials to act in such circumstances suggests that the officials actually want the prison to suffer the harm." *Id.*

The record does not support a finding that defendant Lt. Schlecht knew that the plaintiff was at serious risk of being harmed and decided not to do anything to prevent the harm from occurring. It is undisputed that defendant Lt. Schlecht was unaware of any other inmate reporting a fall in the H-West shower prior to the plaintiff's alleged fall. In addition, Lt. Schlecht cannot recall grievances regarding any difficulty showering in restraints, perceived danger, or injury associated with showering in restraints filed by any inmate prior to the plaintiff. Moreover, the undisputed facts reveal that defendant Lt. Schlecht was involved in an ongoing process to lower the level of the shower button in the H-West unit. There is no indication that defendant Lt. Schlecht delayed the process of retrofitting the shower button. In fact, he requested "prompt action" on the project, which involved design, safety, security, and financing considerations. The shower button was lowered approximately one and a half months after the plaintiff fell.

The plaintiff has not met his burden of producing evidence to support a finding that defendant Lt. Schlecht was deliberately indifferent. Accordingly, the defendants' motion for summary judgment will be granted.

**ORDER**

**IT IS THEREFORE ORDERED** that the defendants' motion for summary judgment (Docket #29) be and hereby is **GRANTED**;

**IT IS FURTHER ORDERED** that the Clerk of Court enter judgment dismissing the plaintiff's claims and this action.

21

Dated at Milwaukee, Wisconsin this <u>31st</u> day of July, 2007.

BY THE COURT:


<u>/s/ William E. Callahan, Jr.</u>
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge

22